IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

MICHAEL A. GRAVES, SR.                                                  PLAINTIFF

V.                 Civil No. 2:16-cv-02187-PKH-MEF

NANCY A. BERRYHILL, Commissioner
Social Security Administration                                              DEFENDANT

**<u>MEMORANDUM OPINION</u>**

Plaintiff, Michael A. Graves, Sr., brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration ("Commissioner") denying his claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act (hereinafter "the Act"), 42 U.S.C. § 423(d)(1)(A). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

**I.     PROCEDURAL BACKGROUND**

Plaintiff filed his application for DIB on August 27, 2013, alleging an onset date of August 23, 2013, due to depression, fibromyalgia, hypertension, gastroesophageal reflux disease ("GERD"), reactive airway disease, neck pain, abnormal glucose, polyarthritis, malaise, fatigue, migraines, and left ankle problems. (ECF No. 9, pp. 61, 74). Based on his work credits, the Commissioner determined that the Plaintiff met the insured status requirements of the Act through December 31, 2018. (ECF No. 9, p. 18).

Plaintiff's application was denied at both the initial and reconsideration levels. An administrative hearing was held on October 29, 2014. The Plaintiff was present and represented by counsel. (ECF No. 9, pp. 34-59). Following the hearing, an administrative law judge ("ALJ") entered an unfavorable decision on May 2, 2015. (ECF No. 9, pp. 16-28).

1

The ALJ concluded that the Plaintiff's hypertension, reactive airway disease, degenerative disc disease ("DDD") at the C5-C6 level, and depression were severe, but they did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (ECF No. 9, pp. 18-20). The ALJ found Plaintiff capable of performing light work, except that he must work in a controlled environment where he would not be exposed to dust, fumes, smoke, or temperature extremes. (ECF No. 9, p. 20). In addition, he can do work with simple tasks and simple instructions. (*Id.*).

At the time of the administrative hearing held on October 29, 2014, Plaintiff was 45 years of age and had obtained a general equivalency diploma ("GED"). (ECF No. 9, pp. 40-41). Plaintiff's past relevant work consisted of working as a spool operator, air conditioner assembler, truck loader, band saw operator, and radio mechanic. (ECF No. 9, p. 26). With the assistance of a vocational expert, the ALJ determined Plaintiff could perform work as a fast food worker and cashier II. (ECF No. 9, p. 27).

Plaintiff requested a review of the hearing decision by the Appeals Council, and the request was denied on May 2, 2015. (ECF No. 9, pp. 5-9). Subsequently, Plaintiff filed this action. (ECF No. 1). Both parties have filed appeal briefs, and the case is now ready for decision. (ECF Nos. 10, 11).

## II. APPLICABLE LAW

This Court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011). The Court must affirm the ALJ's decision if the record contains substantial evidence to

support it. *Blackburn v. Colvin,* 761 F.3d 853, 858 (8th Cir. 2014). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the Court must affirm the ALJ's decision. *Id*.

A claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § 423(d)(1)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his or her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his or her age, education, and experience. *See* 20 C.F.R. § 404.1520(a)(4). Only if he reaches the final stage does the fact finder consider the Plaintiff's age, education, and work

experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982) (en banc) (abrogated on other grounds); 20 C.F.R. § 404.1520(a)(4)(v).

### III.  EVIDENCE PRESENTED

The Court has carefully reviewed the entire transcript. The complete set of facts and arguments are presented in the parties' briefs and are repeated here only to the extent necessary.

A review of the pertinent medical evidence reflects the following. On December 3, 2009, Plaintiff presented to Dr. Magdalena C. Santos, M.D. to establish her as a primary care physician. (ECF No. 9, pp. 1295-97). Plaintiff reported he smoked for the past 18 years, but his breathing problems did not start until after a deployment to Iraq. (*Id.*). Plaintiff complained he could not walk one block without shortness of breath. (*Id.*). Dr. Santos diagnosed Plaintiff with hyperreactive airway disease and tobacco use. (*Id.*). Plaintiff was instructed to continue all present medications, and he reported he had cut down on tobacco use with the help of Bupropion. (*Id.*). A chest X-ray was also within normal limits. (ECF No. 9, p. 826).

On January 4, 2010, Dr. Santos provided a letter stating that Plaintiff suffered from reactive airway disease aggravated by exertion. (ECF No. 9, p. 1293).

On August 19, 2010, Plaintiff saw Dr. Santos and complained of shortness of breath, eyesight problems, midsternal chest discomfort, and cough with phlegm. (ECF No. 9, pp. 1279-82). Dr. Santos diagnosed him with reactive airway disease, probable GERD, and hypertriglyceridemia. (*Id.*). Plaintiff was referred to pulmonology with further testing needed, he was started on Omeprazole, and dietary restrictions were advised. (*Id.*).

August 20, 2010, a chest X-ray showed no acute cardiopulmonary disease. (ECF No. 9, p. 825). An EKG revealed normal sinus rhythm with preservation of right and left ventricular systolic

function. (ECF No. 9, pp. 935-37). Intracardiac chamber dimensions were within normal limits, no significant valvular abnormalities, estimated right atrial pressure was normal, and no significant pericardial effusion was present. (*Id.*).

On September 8, 2010, Plaintiff presented to Dr. Glenda Patterson, M.D., a pulmonologist, and complained of worsening dyspnea with activity, protracted cough, and wheezing. (ECF No. 9, pp. 928-29). Plaintiff reported the symptoms stated while on tour in Iraq in 2008. (*Id.*). Dr. Patterson diagnosed Plaintiff with dyspnea and reactive airway disease secondary to dust, irritant, and pollutant exposure while on tour in the Middle East. (*Id.*). Plaintiff was to continue Asmanex and Combivent, and start Singulair at bedtime. (*Id.*).

Plaintiff also underwent a pulmonary function test ("PFT"). (ECF No. 9, pp. 691-93, 939). Plaintiff's symptoms included dyspnea at rest, dyspnea with exercise, persistent and productive cough, and cigarette smoker. (*Id.*). Dr. Patterson noted the increased FEF/FIF ratio suggested extra thoracic obstruction with a reduced FEF of 25-75 percent, and PEF suggested presence of obstruction. (*Id.*). The PFT also showed mild response to bronchodilators, mild restrictive impairment, and mild gas transfer abnormality. (*Id.*). Dr. Patterson recommended clinical correlation to exclude extra-thoracic obstruction. (*Id.*).

On September 14, 2010, a chest computed tomography ("CT") scan showed patchy right base consolidation without pleural effusion or definite mass, and no pathologic-sized adenopathy. (ECF No. 9, pp. 824-25). Results could have represented ordinary pneumonia superimposed on minimal underlying chronic lung disease. (*Id.*). Clinical and radiographic follow up was recommended. (*Id.*). Six minute walk test showed resting room air saturation was 98 percent with a heart rate of 74, exercise at 200 feet was air saturation of 98 percent with a heart rate of 96, at

5

400 feet was air saturation of 99 percent with a heart rate of 88, and 600 feet was air saturation of 98 percent with a heart rate of 103. (ECF No. 9, p. 1268).

On October 21, 2010, Plaintiff presented to Dr. Patterson, and Plaintiff remained dyspneic, had decreased pace for activities, avoided strong odors, coughed with irritating agents, and was less jittery with Foradil. (ECF No. 9, pp. 1263-64). Dr. Patterson diagnosed Plaintiff with reactive airway disease with less episodes while on Singulair. (*Id.*). Dr. Patterson noted Plaintiff avoided known triggers such as perfume and strong odors, no diffuse parenchymal process found on CT scan, and no desaturation with activity. (*Id.*). Dr. Patterson referred Plaintiff for an allergy evaluation to narrow the range of inciting agents, and Combivent, Singulair, and Asmanex were continued. (*Id.*).

On October 28, 2010, Plaintiff presented to Dr. Michael Marsh, M.D., an ENT-otolaryngologist, and he was diagnosed with asthma. (ECF No. 9, p. 694). Plaintiff was allergy tested and subsequently received regular allergy desensitization injections. (ECF No. 9, p. 696-99, 702-07, 758-63, 905, 911-15).

On January 11, 2011, Dr. Patterson diagnosed Plaintiff with stable reactive airway disease, multiple allergies, and arthralgias with unknown etiology. (ECF No. 9, pp. 1249-50). The plan was to continue Combivent, Asmanex, and Singulair. Plaintiff was to follow up with an allergist and rheumatology studies. (*Id.*).

On January 24, 2011, Dr. Santos noted Plaintiff's ESR and rheumatoid factor were negative, and his ANA was 1:80 which was considered equivocal. Dr. Santos opined the joint pain could be part of his allergy syndrome. (ECF No. 9, p. 1246).

On February 8, 2011, a CT scan of Plaintiff's thorax showed resolved right lower lobe consolidation and middle lobe atelectasis, and persistent left lingular subsegmental atelectasis or scarring. (ECF No. 9, pp. 821-23).

On March 8, 2011, Plaintiff's lab testing showed a mild case of inflammatory arthritis with an ANA of 1:80. (ECF No. 9, p. 1242). Dr. Santos decided because of the pain Plaintiff was experiencing, a short course of low dose Prednisone was necessary. (*Id.*). Plaintiff's Diclofenac was also changed to Sulindac. (*Id.*).

On June 21, 2011, Plaintiff presented to Dr. Patterson, and he reported working on an assembly line and that it was tiring when walking from one end to the other. (ECF No. 9, pp. 1236-37). Plaintiff continued to smoke, had dyspnea with activity, and experienced a burning sensation in the upper airway. (*Id.*). Dr. Patterson diagnosed him with continued dyspnea, smoking, and reduced PEF and PRTs suggested there was obstruction present although not evident from spirometry. (*Id.*). The plan was to optimize a bronchodilator regimen of Spiriva, Asmanex, Albuterol PRN; continue Singulair Claritin, and Flonase; and, reschedule an allergy visit for injections. (*Id.*).

On August 1, 2011, Dr. Santos provided a letter stating that Plaintiff suffered from reactive airway disease aggravated by exertion. (ECF No. 9, p. 1234).

On August 15, 2011, Plaintiff presented to Dr. Santos and complained of multiple joint pain and swelling, but his ANA was only 1:80. (ECF No. 9, pp. 1219-22). Plaintiff noted Meloxicam did not help much. (*Id.*). Dr. Santos diagnosed Plaintiff with multiple joint pains and swelling, suspected rheumatoid arthritis, ordered a dose of Depo-Medrol, and noted that he needed a rheumatologist consultation. (*Id.*).

On October 4, 2011, Plaintiff presented to Dr. Patterson for a follow up visit. (ECF No. 9, p. 1121). Dr. Patterson noted allergy injections started with decreased severity of flares. (*Id.*). Flonase also helped nasal congestion, and airways were less tight with use of inhalers. (*Id.*). Plaintiff continued to have intermittent dyspnea with no significant change, and he continued to smoke half a pack of cigarettes daily. (*Id.*). Dr. Patterson diagnosed Plaintiff with reactive airway disease that was clinically unchanged, hypersomnolence, and abdominal firmness that was perhaps part of the rib. (*Id.*). Dr. Patterson continued the current bronchodilator regimen, scheduled a sleep study, and ordered an ultrasound of the abdomen. (*Id.*).

On October 11, 2011, a chest X-ray showed no acute cardiopulmonary disease. (ECF No. 9, p. 821).

On October 12, 2011, an ultrasound of the abdomen showed slight inhomogeneity of the hepatic echotexture most likely secondary to fatty infiltration. (ECF No. 9, pp. 819-20). Correlation with LFTs was recommended. (*Id.*).

On February 6, 2012, a PFT showed restrictive impairment and a moderate gas transfer abnormality with mild response to bronchodilators. (ECF No. 9, pp. 700-01, 910).

On August 15, 2012, Dr. Santos noted that she suspected rheumatoid arthritis due to Plaintiff's typical symptoms of pain that improved throughout the day, but Plaintiff's lab results were negative. (ECF No. 9, pp. 513-19). Dr. Santos ordered another arthritis panel and a Toradol injection was administered in the right deltoid. (*Id.*).

On August 30, 2012, Dr. Santos diagnosed Plaintiff with bilateral wrist tenosynovitis and bilateral knee patellofemoral syndrome with an unknown etiology. (ECF No. 9, pp. 655-56).

On November 13, 2012, Plaintiff presented to Ms. Kimberly Divis, P.T., and reported he was currently employed as a machine operator which required standing for extended periods as

8

well as use of his bilateral upper extremities. (ECF No. 9, pp. 583-84). Ms. Divis noted Plaintiff had not tried braces for involved joints, but was wearing resting wrist splints and they were helpful. (*Id.*). Plaintiff was issued bilateral knee braces and was measured for bilateral elbow braces. (*Id.*).

On April 25, 2013, a left shoulder and elbow X-ray showed no acute osseous abnormality. (ECF No. 9, pp. 310-11, 817-19).

On May 30, 2013, Plaintiff went to the emergency department at Sparks Regional Medical Center because he developed burning chest pain, pressure, and left side tingling during his shift as a machine operator. (ECF No. 9, p. 453, 461-98, 533-42). He was later transferred to the VA hospital in Fayetteville. (ECF No. 9, p. 709). A cervical spine X-ray showed no acute bone or joint abnormality. (ECF No. 9, pp. 305-06, 813-14). An EKG showed sinus bradycardia with preservation of right and left ventricular systolic function and a Q wave was present. (ECF No. 9, pp. 350-51, 454-55, 754). A Carotid ultrasonography showed no evidence of hemodynamically significant stenosis was demonstrated in either internal carotid artery with minimal bilateral intimal thickening and soft plaque, and bilateral antegrade vertebral flow was confirmed. (ECF No. 9, pp. 307-08, 814-15). A SPECT myocardial perfusion imaging showed isolated PVCs and no significant ST segment changes. (ECF No. 9, pp. 449-50).

A head CT scan showed no acute intracranial hemorrhage, mass, mass effect, or midline shift. (ECF No. 9, pp. 308-09, 816-17). There was evidence of chronic sinusitis. (*Id.*). A second EKG administered the following day showed a continued Q wave. (ECF No. 9, pp. 529-30, 753). Plaintiff was discharged from the hospital on May 31, 2013 with a diagnosis of atypical chest pain, left side tingling of uncertain etiology, chronic sinusitis, reactive airway disease, dyslipidemia, and polyarthritis. The hospitalist, Dr. Bang Hoang, M.D., determined Plaintiff could perform physical

activity as tolerated, but no strenuous work until permitted by Dr. Santos. (ECF No. 9, p. 453, 461-98).

On June 4, 2013, an EKG was negative for ischemia and infarction. (ECF No. 9, pp. 297-305, 711-52, 805-13). Left ventricle ejection fraction was 59 percent at post stress. (*Id.*). No gross left ventricular dilatation with no focal well hypokinesis. (*Id.*). A nuclear stress test showed isolated PVCs and no significant ST segment changes. (ECF No. 9, pp. 1101-06).

On June 6, 2013, Plaintiff reported he was unable to perform his working duties due to the physical components of his job. (ECF No. 9, pp. 442-44). Plaintiff complained of chest tightness, left-side numbness, and harder breathing. (*Id.*). A chest X-ray revealed no acute cardiopulmonary disease. (ECF No. 9, pp. 296-97). Plaintiff's stress test was negative. (ECF No. 9, pp. 446-47, 450-51). A cervical spine X-ray showed no abnormality and no change observed since May 31, 2013. (ECF No. 9, pp. 295-96). Dr. Santos determined Plaintiff could return to work with no restrictions on activities. (ECF No. 9, pp. 446-47).

On June 11, 2013, a thoracic spine X-ray revealed a normal thoracic spine. (ECF No. 9, p. 295). Right and left ankle X-rays showed normal ankles. (ECF No. 9, pp. 293-294).

On June 19, 2013, Plaintiff reported to Dr. Santos that he was run over by a truck several years ago, hit his head, and had left side numbness. Dr. Santos tested Plaintiff twice for ANA, but both results were equivocal. (ECF No. 9, pp. 407-08). Dr. Santos referred Plaintiff to a rheumatologist. (*Id.*). Left and right hand X-rays also showed no osseous abnormality. (ECF No. 9, pp. 291-292).

On August 15, 2013, Plaintiff presented to Dr. Santos. (ECF No. 9, pp. 395-98). Plaintiff reported he was losing grip in the left upper extremity. (*Id.*). Dr. Santos found Plaintiff's hypertension was stable on HCTZ, and at the exam his blood pressure was 127/70. (*Id.*). Plaintiff

was diagnosed with polyarthralgia and was awaiting a rheumatology appointment. (*Id.*). It was noted that his joints were obviously swollen, but the labs were not congruent. (*Id.*). Plaintiff was also diagnosed with left arm numbness, fatigue, GERD, allergies, resolved abnormal glucose, and hyperlipidemia. (*Id.*). Regarding Plaintiff's reactive airway disease, Dr. Santos noted Plaintiff was still getting short of breath. (*Id.*).

The medical evidence continues after the alleged onset date of August 23, 2013. On August 27, 2013, a magnetic resonance imaging ("MRI") of Plaintiff's cervical spine showed normal findings. (ECF No. 9, pp. 290-91, 558-59). The MRI study revealed a single level of degenerative uncovertebral joint change seen at C5-6 where degenerative hypertrophy resulted in only mild bilateral neural foramina narrowing. (*Id.*). The cervical spine was otherwise unremarkable with the exception of straightening of the normal lordosis which may be secondary to positioning and/or muscle spasms. (*Id.*).

On September 3, 2013, Plaintiff reported to Ms. Shannon L. Garner, LCSW during a therapy session that his physical limitations increased his mood symptoms. (ECF No. 9, pp. 377-383). Plaintiff denied suicidal and homicidal ideation. (*Id.*). Ms. Garner diagnosed Plaintiff with major depression, single episode, and assigned a global assessment of functioning ("GAF") score of 55. (*Id.*).

On September 25, 2013, Plaintiff reported to Dr. Han Soe, M.D., a psychiatrist, regarding his problems with depression and anxiety. (ECF No. 9, pp. 367-76). Plaintiff reported being easily angered, snapping quickly, and blowing up more. (*Id.*). Plaintiff reported smoking one pack of cigarettes per day, and he only gets two hours of undisturbed sleep each night. (*Id.*). Dr. Soe found he was a low and not imminent risk for suicide. (*Id.*). Dr. Soe diagnosed Plaintiff with major depressive disorder; mood disorder associated with possible sleep apnea; and, anxiety

disorder, primarily hyperarousal syndrome. (*Id*.). Plaintiff was prescribed Sertraline, Zolpidem, and ordered to participate in a sleep study. (*Id*.).

On September 26, 2013, Plaintiff underwent a sleep study. (ECF No. 9, pp. 332-33, 756-57). Plaintiff was diagnosed with moderate obstructive sleep apnea that required treatment with continuous positive airway pressure. (*Id*.).

On October 4, 2013, Dr. Santos noted Plaintiff's sleep study revealed sleep apnea and a CPAP machine was ordered. (ECF No. 9, pp. 367, 621).

On October 7, 2013, Plaintiff presented to Ms. Garner for therapy services, and he reported his irritability improved with medication. (ECF No. 9, pp. 621-24). Plaintiff also noted he was able to calm down more easily, and his situation with his children was improving. (*Id*.).

On October 31, 2013, state agency medical consultant, Dr. Rita Allbright, M.D., completed a Case Analysis at the initial level. (ECF No. 9, pp. 65-66). Dr. Allbright found that owing to the totality of the evidence, the medical evidence record supported no severe physical impairments. (*Id*.).

On November 15, 2013, state agency medical consultant, Dr. Kay M. Gale, M.D., completed a Psychiatric Review Technique (PRT) at the initial level. (ECF No. 9, pp. 66-67). Dr. Gale cited Listing 12.04, affective disorders, and 12.06, anxiety-related disorders, as the listings considered in the analysis. (*Id*.). Dr. Gale assessed that Plaintiff had mild limitations with activities of daily living; moderate limitations with social functioning; and, moderate limitations maintaining concentration, persistence, or pace. (*Id*.). No episodes of decompensation were noted. (*Id*.). Dr. Gale also completed a Mental Residual Functional Capacity Assessment at the initial level. (ECF No. 9, pp. 67-69). Dr. Gale determined Plaintiff's severe impairments were major depression, mood disorder, and anxiety disorder. (*Id*.). Dr. Gale assessed Plaintiff was able to

12

perform simple, routine, repetitive tasks in a setting where interpersonal contact is incidental to work performed, supervision required is simple, direct, and concrete. (ECF No. 9, p. 69).

On November 20, 2013, Plaintiff presented to Dr. Soe for psychiatric care. (ECF No. 9, pp. 612-17). Plaintiff reported Sertraline had no adverse effects, and the medication definitely helped by preventing him from losing his temper quickly, takes the edge off, and his wife was happier. (*Id*.). Plaintiff also reported he was down to half a pack of cigarettes per day, and he declined smoking cessation group or nicotine replacement therapy. (*Id*.). Dr. Soe made no medication changes during the office visit. (*Id*.).

On December 13, 2013, a chest X-ray showed no active cardiopulmonary disease with no change from the June 6, 2013 exam. (ECF No. 9, p. 558).

On January 3, 2014, Plaintiff began an outpatient mental health treatment plan. (ECF No. 9, pp. 594-96). Plaintiff reported wanting to feel less angry and depressed. (*Id*.). Plaintiff was diagnosed with the following: major depressive disorder, single episode, unspecified; financial psychosocial stressor; and, a GAF score of 57. (*Id*.). The plan was to meet with Ms. Garner for therapy services once a month for nine months. (*Id*.).

On January 22, 2014, an informal physical evaluation conducted by the VA found Plaintiff was physically unfit due to major depressive disorder and asthma. (ECF No. 9, p. 685-90). A 70% impairment rating was recommended. (*Id*.). Plaintiff's depression symptoms included irritability, withdrawal, decreased level of interest and social inactivity leading to difficulty focusing and concentrating. (*Id*.). Plaintiff's asthma did not permit an aerobic APFT event, and it prevented him from carrying out all military functional activities except firing his weapon, wearing boots, and wearing his uniform. (*Id*.).

On January 31, 2014, Plaintiff presented to Ms. Garner for therapy services regarding major depression. (ECF No. 9, pp. 590-92). Plaintiff reported financial stress contributed to low mood or depressive symptoms, and his wife noted family living with the couple was stressful. (*Id*.). Ms. Garner found Plaintiff's mood and affect were fair to good. (*Id*.). Plaintiff was diagnosed with major depressive disorder with family and financial psychosocial stressors. (*Id*.).

On February 10, 2014, the United States Army Physical Disability Agency provided a Permanent Physical Disability Retirement memorandum. (ECF No. 9, pp. 167-69). Plaintiff was found to have a disability, and he was permanently retired with a disability rating of 70%. (*Id*.).

On April 10, 2014, state agency medical consultant, Dr. Steven Strode, M.D., affirmed Dr. Allbright's assessment of no severe physical impairments at the reconsideration level. (ECF No. 9, pp. 80-81).

On April 12, 2014, state agency medical consultant, Dr. Diane Kogut, Ph.D., affirmed Dr. Gale's PRT analysis and mental RFC assessment at the reconsideration level. (ECF No. 9, pp. 82-85).

Plaintiff presented to Ms. Garner for therapy services on March 28, May 30, and June 11, 2014. (ECF No. 9, pp. 970-75, 980-83). He reported financial concerns caused stress within the home. (*Id*.). He also complained his mood was lower and he and his wife were having more conflicts. (*Id*.). Plaintiff commented his physical health was contributing to decrease in mood, and his pain was worse with symptoms such as difficulty walking, dropping items, and difficulty picking up things. (*Id*.). Plaintiff was also frustrated the VA did not give him 100 percent disability, and he was awaiting an appeal. (*Id*.). Ms. Garner diagnosed him with major depressive disorder with family and financial psychosocial stressors. (*Id*.).

On June 12, 2014, Plaintiff presented to Dr. Florence Guthrie, M.D. for a psychiatric follow up visit, and he reported increasing Sertraline helped some with anxiety by not being as irritable. (ECF No. 9, pp. 956-62). Plaintiff denied side effects from medications, and he agreed to an increase in Sertraline to 150 mg for mood. (*Id*.). Plaintiff as diagnosed with major depressive disorder. (*Id*.). Dr. Guthrie added Hydroxyzine prn for anxiety and sleep, but if not effective for sleep Trazodone could be taken. (*Id*.). Plaintiff continued to smoke half a pack of cigarettes per day. (*Id*.).

On July 16, 2014, Plaintiff presented to Ms. Garner for therapy services and reported depression was increasing due to financial stress. (ECF No. 9, pp. 953-56). Ms. Garner diagnosed Plaintiff with major depressive disorder, and his interim change was worse than before. (*Id*.).

On July 28, 2014, Plaintiff presented to Dr. Santos and complained of right side pain, pain from the neck down to the right side of his leg, and hand numbness. (ECF No. 9, pp. 942-46). Plaintiff was not able to make it to the rheumatology appointment in Little Rock. (ECF No. 9, p. 555). Dr. Santos noted Plaintiff's pain symptoms were not polyarthralgia, but more like neuropathic pain. (*Id*.). Gabapentin was increased to 600 mg, Tramadol was increased to 100 mg, and Etoldac 300 mg was added. (*Id*.). Dr. Santos also noted Plaintiff's reactive airway disease was stable on inhalers and Singulair. (*Id*.).

On August 19, 2014, Plaintiff returned to Ms. Garner for therapy services, and he reported isolating, sleeping more, and struggling with continued physical pain. (ECF No. 9, p. 1365-68). He also complained of financial problems that were taking a toll on the entire family. (*Id*.). Ms. Garner diagnosed Plaintiff with major depressive disorder, financial stressor, and family stressor because of two adult sons living at home. (*Id*.).

On September 4, 2014, Plaintiff reported to Dr. Guthrie that he was doing okay on 150 mg of Sertraline, his medications such as Trazodone and Hydroxyzine helped, and he wanted to keep the dosage the same. (ECF No. 9, p. 1353-63). Plaintiff also complained of anxiety while waiting on a Social Security ruling. (*Id.*). Plaintiff's goal for treatment was a stable mood free from excessive anxiety and depression along with adequate restful sleep. (*Id.*).

Plaintiff saw Ms. Garner for therapy services on September 18 and November 3, 2014. (ECF No. 9, pp. 1338-40, 1348-53). Plaintiff reported he had not been granted 100% service connected disability or social security disability benefits. (*Id.*). Plaintiff complained he was struggling to make ends meet, and his physical limitations and pain were adding increased depression. (*Id.*). Ms. Garner diagnosed him with major depressive disorder with family, financial, and health psychosocial stressors. (*Id.*).

On October 8, 2014, a chest X-ray showed no active cardiopulmonary disease. (ECF No. 9, p. 1319).

The ALJ issued an unfavorable decision on May 2, 2015. (ECF No. 9, pp. 16-28).

### IV. DISCUSSION

Plaintiff raised the following issues on appeal: (1) whether the ALJ fully and fairly developed the record; (2) whether the ALJ properly reached his Step Two finding; and, (3) whether the ALJ erred in his RFC determination. While the Court finds substantial evidence to support the ALJ's determination regarding Plaintiff's mental impairments and his mental RFC, after reviewing the entire record, the Court cannot say the same about Plaintiff's physical impairments. Of particular concern is Plaintiff's contention that the ALJ did not attempt to develop any opinion evidence concerning the level of physical work activity Plaintiff could perform on a sustained basis

16

in view of the combination of impairments. (ECF No. 10, p. 8). Following a thorough review of the record, the Court finds that remand is necessary.

Plaintiff's primary care physician, Dr. Santos, did not provide evidence that conclusively supported the ALJ's RFC finding. On January 4, 2010 and August 1, 2011, Dr. Santos provided letters stating that Plaintiff suffered from reactive airway disease aggravated by exertion. (ECF No. 9, pp. 1234, 1293). Conversely, on June 6, 2013, Dr. Santos found Plaintiff could return to work with no restrictions on activities after obtaining negative stress test results. (ECF No. 9, pp. 446-47, 450-51). However, eight days prior to the alleged onset date of August 23, 2013, Dr. Santos found Plaintiff was still getting short of breath. (ECF No. 9, pp. 395-98). Dr. Santos also noted it was obvious that Plaintiff's joints were swollen, but the lab results were not congruent. (*Id.*). Dr. Santos sought further insight and referred Plaintiff to a rheumatologist in Little Rock, but Plaintiff was unable to make it to the appointment. (ECF No. 9, p. 555). Nearly a year later on July 28, 2014, Dr. Santos concluded Plaintiff's pain symptoms were not polyarthralgia, but more like neuropathic pain. (ECF No. 9, pp. 942-46). Dr. Santos increased Plaintiff's medication regimen to 600 mg of Gabapentin, 100 mg of Tramadol, and 300 mg of Etoldac was added. (*Id.*). Dr. Santos also noted Plaintiff's reactive airway disease was stable on inhalers and Singulair. (*Id.*). Although Dr. Santos treated Plaintiff for a variety of impairments, she was most focused on determining the etiology of Plaintiff's chronic joint pain. Unfortunately, a review of the record shows Plaintiff never saw a rheumatologist or a neurologist for further diagnosis and treatment.

The record also reflects Plaintiff's longstanding history of reactive airway disease, but there is insufficient evidence to determine how the impairment effects his ability to perform light work. Plaintiff admitted he was a smoker, but he stated his breathing problems did not start until after a deployment to Iraq. (ECF No. 9, pp. 1295-97). Plaintiff's pulmonologist, Dr. Patterson, diagnosed

him with dyspnea and reactive airway disease secondary to dust, irritant, and pollutant exposure while on tour in the Middle East. (ECF No. 9, pp. 928-29). Objective medical testing such as a PFT conducted on February 6, 2012 showed restrictive impairment and a moderate gas transfer abnormality with mild response to bronchodilators. (ECF No. 9, pp. 700-01, 910).

Plaintiff remained dyspneic over time, and he had a decreased pace for activities, avoided strong odors, and coughed with irritating agents. (ECF No. 9, pp. 1121, 1263-64). Plaintiff tired with exertion, and he reported that working on an assembly line was tiring when walking from one end to the other. (ECF No. 9, pp. 1236-37). On June 6, 2013, Plaintiff reported he was unable to perform his working duties due to the physical components of his job. (ECF No. 9, pp. 442-44). At times, Drs. Patterson and Santos diagnosed Plaintiff's reactive airway disease as stable, but more clarification is necessary to determine how his exertional capabilities are impacted. (ECF No. 9, pp. 942-46, 1249-50).

Furthermore, the physical opinion evidence in the record was discounted by the ALJ. (ECF No. 9, pp. 25-26). The VA ultimately determined Plaintiff was physically unfit due to major depressive disorder and asthma. (ECF No. 9, pp. 167-69, 685-90). Plaintiff's depression symptoms included irritability, withdrawal, decreased level of interest and social inactivity leading to difficulty focusing and concentrating. (*Id*.). Plaintiff's asthma did not permit an aerobic APFT event, and it prevented him from carrying out all military functional activities except firing his weapon, wearing boots, and wearing his uniform. (*Id*.). Plaintiff was permanently retired from the military with a disability rating of 70% on February 10, 2014. (*Id*.). The ALJ gave the VA disability rating little weight for the following reasons: the VA applied different rules and standards for determining disability that were not binding on the ALJ; evidence did not indicate the VA found Plaintiff unemployable; VA did not consider whether Plaintiff was capable of

18

performing other work; and, Plaintiff's prior work activity and activities of daily living were not taken into account. (ECF No. 9, pp. 25-26).

State agency medical consultants, Drs. Allbright and Strode, both found the medical evidence record supported no severe physical impairments at all. (ECF No. 9, pp. 65-66, 80-81). The ALJ assigned little weight to their opinions by reasoning the opinions were not consistent with the medical evidence submitted at the hearing level, and adequate consideration was not given to the Plaintiff's subjective complaints of pain. (ECF No. 9, p. 25).

Additionally, no physical RFC assessments were provided by Plaintiff's treating physicians, and the ALJ did not order any consultative examinations. The ALJ has a duty to fully and fairly develop the record. *See Frankl v. Shalala*, 47 F.3d 935, 938 (8th Cir. 1995); *Freeman v. Apfel*, 208 F.3d 687, 692 (8th Cir. 2000). This can be done by re-contacting medical sources and by ordering additional consultative examinations, if necessary. *See* 20 C.F.R. § 404.1512. "[I]t is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision." *Freeman*, 208 F.3d at 692; *Dozier v. Heckler*, 754 F.2d 274, 276 (8th Cir. 1985). The ALJ was essentially "playing doctor" after he disregarded the VA disability rating and discounted the opinions of both non-examining state agency medical consultants while lacking a sufficient basis within the other evidence of record to support his RFC determination. *Pates-Fires v. Astrue*, 564 F3d 935, 947 (8th Cir. 2009), citing *Rohan v. Chater*, 98 F.3d 966 (7th Cir. 1996) ("ALJ's must not succumb to the temptation to play doctor and make their own independent medical findings."). Because the evidence does not make clear Plaintiff can perform the duties of light work with additional limitations, we find remand is necessary to allow the ALJ to consider this further.

On remand, the ALJ is directed to contact Plaintiff's treating physicians, Drs. Santos and Patterson, requesting that said physicians review Plaintiff's medical records; complete a physical RFC assessment regarding Plaintiff's functional capabilities; and, to state the objective basis for the assessment so that an informed decision can be made by the ALJ regarding Plaintiff's ability to perform work activities on a sustained basis. The assessment should also specifically address how long Plaintiff can stand and walk during an eight-hour workday, and whether he should avoid exposure to dust, fumes, smoke, or temperature extremes altogether. The ALJ is also directed to order a consultative examination from a neurologist or rheumatologist, and the consultative examiner should be asked to review the medical evidence of record, perform examinations and appropriate testing needed to properly diagnose Plaintiff's chronic pain, and complete a physical RFC assessment of Plaintiff's abilities to perform work related activities. With this additional medical opinion evidence, the ALJ should then reconsider the Plaintiff's RFC.

## V. CONCLUSION

Accordingly, the Court concludes that the ALJ's decision is not supported by substantial evidence, and therefore, the denial of benefits to the Plaintiff should be reversed and this matter should be remanded to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

DATED this 14th day of February 2018.

/s/ P. K. Holmes, III
P. K. HOLMES, III
CHIEF U.S. DISTRICT JUDGE